Filed 6/3/14  P. v. Mendoza CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### THIRD APPELLATE DISTRICT

### (San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C071775 |
| Plaintiff and Respondent, | (Super. Ct. Nos. SF115887A, SF115887B) |
| v. | |
| EMMANUEL MATHEW MENDOZA et al., | |
| Defendants and Appellants. | |

A jury found codefendants Emmanuel Mathew Mendoza and Edgar Jose Canseco guilty of first degree murder and attempted second degree robbery.  With respect to both defendants, the jury also sustained firearm and gang enhancement allegations as to each offense, and special circumstance allegations that the murder occurred during the commission of an attempted robbery.

The trial court sentenced both defendants to state prison for an indeterminate life term without the possibility of parole, consecutive to an eight-year determinate term for

1

the attempted robbery, one firearm enhancement, and one gang enhancement. (The court imposed and stayed the second firearm and gang enhancements.)

Defendant Canseco asserts that the first degree murder verdict is flawed because the instructions allowed for an amalgam of first degree and second degree theories; the felony-murder rule and the felony-murder special circumstance should not apply to the derivative liability theory of conspiracy; and he cannot be sentenced both for a felony murder and the underlying felony. (His codefendant does not join in these claims.) Defendant Mendoza (joined by his codefendant) contends the trial court erred in allowing an expert to offer the opinions that defendants intended their crimes to benefit a gang and committed them with an intent to promote or assist the criminal conduct of members of a gang; and there is otherwise insufficient evidence to support either this enhancement or the special circumstance finding. We shall affirm the judgments.

## FACTUAL AND PROCEDURAL BACKGROUND

The murder victim, Kevin Prater, his girlfriend, and defendant Canseco had been friends since attending a high school in Tracy.[1] In September 2010, the girlfriend (who had moved out of state) was visiting her local family and the victim. She was the primary eyewitness to the crimes.

A few days before the events underlying the convictions, the three had gone out for fast food. During the hour or so that they spent together, the girlfriend did not sense anything out of the ordinary about defendant Canseco's behavior. In the early evening on September 15, the girlfriend and the victim were watching television at his mother's home. Defendant Canseco kept trying to call the victim, who at first was ignoring the calls. The victim eventually answered and spoke with defendant Canseco, then told the

---

[1] As a gang expert noted off the record, investigators were never able to locate anyone who could establish a connection between defendants.

2

girlfriend that they were going to go pick him up (a courtesy they often offered each other).**2**

The victim was wearing a large amount of expensive jewelry, including a gold watch, diamond earrings, a gold chain, a three-diamond ring, a diamond tennis bracelet, and a detachable gold crown cap over his top front teeth. The total estimated value was about $3,000. In the car's console were an imitation Rolex and his mother's broken gold nugget tennis bracelet (the estimated value of the latter was $3,495), which she had given to him a couple of weeks earlier to get fixed.

The victim drove to a cul-de-sac west of Tracy Boulevard bordered on the south side by train tracks, which were fenced off (although there was an opening cut in the fencing), and on the north side by houses. Oleanders grew along the fence. The location was not well illuminated. Defendant Canseco was standing in the road near the shrubbery. The girlfriend testified that she and the victim had remarked "it looked like he on something." As defendant Canseco was wearing a black hooded sweatshirt over his red hat and shirt, getting picked up in the middle of nowhere and looking ill at ease, she thought he also looked like he was up to something and being sneaky.

Defendant Canseco got into the back seat and started texting. The girlfriend wanted to go to the grocery store to get a snack, but defendant Canseco asked them first to drive to a house on Beechnut Street, which was on the south side of the train tracks near Alden Park. This was near the other side of the opening in the fence. Defendant Canseco briefly went inside while the others waited.

---

**2** Although not the subject of testimony at trial, the probation report notes that texts between the two (contained in an admitted exhibit of defendant Canseco's cell phone log) indicate defendant Canseco was offering to get marijuana for the victim, who could not afford it. (Defendant Canseco's texts automatically concluded with a nickname, "Pelon" (meaning "Baldy").

On his return, they drove to the store, which was less than five minutes away. Defendant Canseco continued texting on his phone. The girlfriend went in to get her snack. When she came back, defendant Canseco asked them to return to the cul-de-sac to get "something" from a friend. When they arrived, defendant Mendoza was standing about where defendant Canseco had been. He got in the back seat behind the girlfriend. The girlfriend testified that he had looked familiar to her when he got into the car, and she thought he may have attended high school with them.[3]

Less than a minute later a tall and slender man dressed in dark clothing and wearing a mask, suddenly appeared at the driver's window with a long gun and demanded the victim's property. He was loud and aggressive. The victim turned to defendant Canseco and asked angrily if this was "what you on" (the girlfriend interpreting his remark for the jury as meaning that he could not believe defendant Canseco had set him up). Defendant Canseco did not respond. The victim began tussling with the stranger for control of the weapon. Both defendants started trying to restrain him from the back seat. The girlfriend was in the process of escaping from the car when she heard a single shot, and ducked into some nearby oleander bushes. Both defendants and the shooter ran off through the opening in the fence.

The victim hit the gas pedal with his foot and the car drove off down the cul-de-sac to Tracy Boulevard, where it crashed. He died from a gunshot wound that appeared unremarkable on the surface but resulted in "explosive" internal injuries, indicating it was likely a high-velocity bullet fired from a rifle.

The girlfriend, who had hidden to make sure the other men were gone, ran down the street to the car. A police officer who had been patrolling nearby was already there,

---

[3] Other than a couple of communications earlier in the day on September 15, phone records for the period from late July to late September 2010 did not list any contacts between the two defendants before that day.

arriving a minute after a 911 call at 9:01 p.m. Within minutes, other police officers arrived at the scene. The girlfriend told them about the attempted robbery and gave them defendant Canseco's name. She later identified defendant Mendoza in a photographic lineup.

Two residents of the cul-de-sac also testified about their observations that night. The details vary somewhat from the girlfriend's. As the girlfriend's testimony otherwise is substantial evidence of the circumstances of the offenses, we omit a summary of these other witnesses because they do not add anything material.

Defendant Canseco was arrested the following evening when the police stopped a car in which he was travelling.[4] The police obtained a warrant for defendant Mendoza's arrest a few days later after his identification. He was eventually captured in Cuidad Juarez, Mexico, in October 2011.

As noted above, there was an exhibit of texts to and from defendant Canseco on the evening of September 15, 2010. Between 8:00 and 9:00 p.m., in addition to texts between the victim and Canseco, there were a number sent between Canseco (area code 510) and Mendoza (area code 209), and Canseco and a person nicknamed Taz[5] (area

---

[4] Although the evidence was not admitted at trial for obvious reasons, the probation report notes that during his interrogation after his arrest, defendant Canseco identified defendant Mendoza as his accomplice and another person (James Stancampiano) as the shooter. The latter was still at large as of the date of the report (July 2012).

[5] Taz apparently obtained the 925 phone from a friend in July 2010. Taz's mother knew defendant Mendoza because he "did music" with Taz on recording equipment in Taz's bedroom; another music-making friend was James Stancampiano. She did not know defendant Canseco. A note with Taz's name and phone number was in defendant Canseco's dresser drawer. Some of the communications from defendant Canseco to his brother on the night of the murder were sent from the 925 phone, as well as his 510 phone. The gang expert was familiar with Taz from previous contacts. The record indicates Taz was in custody in an Alameda County jail facility at the time of trial, but did not testify.

code 925). In response to Taz's query, Canseco said he was at a park (Alden) on Palm Circle at 8:10 p.m., a street running south from Beechnut Street near the fence opening. Taz said he would walk there. At 8:35 p.m., defendant Canseco told Mendoza to start walking and told Taz at 8:38 p.m. to act as a lookout. At 8:40 p.m., Canseco told Mendoza "he" (i.e., the victim) was trying to leave and that they would be heading to Beechnut Street. At 8:43 p.m., Canseco told Mendoza to go down Beechnut away from Tracy, and then a minute later told him to go back to the cul-de-sac. Mendoza told Canseco to act as if he was picking up a "bag" (presumably of marijuana) from him. At 8:47 p.m. and 8:48 p.m., Canseco told Mendoza that he would be right back after they stopped at the grocery store. (At the same time, the victim sent his final text, asking where defendant Canseco was.) At 8:51 p.m., Taz asked if "he" was armed; Canseco assured Taz "he" was not, and let Taz know that "he" was wearing a gold crown front cap. At 8:54 p.m. and 8:55 p.m., Canseco said they were on the way and told Mendoza to be ready. Mendoza asked if Canseco had said he was getting marijuana; Canseco answered in the affirmative. Canseco asked Mendoza if he should stay in the car when picking up the marijuana or get out. At 8:58 p.m., Mendoza told him to stay in the car, and said he was going to be at the corner. As noted, the 911 call occurred at 9:01 p.m.

Defendant Canseco had called his brother later that evening and told him to move ammunition from defendant Canseco's room to the brother's room, and to leave the front door unlocked. The brother knew that the ammunition was for a sawed-off rifle that defendant Canseco owned. Defendant Canseco had sent pictures to his girlfriend of himself and his brother showing Canseco holding a rifle. In a search of the Canseco home on the morning after the shooting, police retrieved the ammunition from the brother's room and a scope in defendant Canseco's room. These were compatible with the model of the rifle he appeared to be holding in the photographs, and a fragment

6

retrieved from the victim was a base of a bullet of the same size as the ammunition. This ammunition usually inflicted wounds similar to the victim's.

## DISCUSSION

### I. Defendant Canseco's Contentions

#### A. *The Possibility of a Nonunanimous Murder Verdict Was Not Present*

The trial court instructed the jury after closing arguments. In the segment of the instructions devoted to the charge of murder, the trial court informed the jury that "[t]he Defendants have been prosecuted for murder under three theories. And these were discussed yesterday. One is malice aforethought. Two, felony murder of the first degree. And, three, murder of the second degree. Each theory of murder has different [elements], and I will instruct you on all of them . . . . You may not find the Defendants guilty of murder unless all of you agree that the People have proved that the Defendants committed murder under at least one of these theories. *You do not all have to agree on the same theory.*"[6] (Italics added.) Taking up the element of malice necessary to establish murder, the trial court instructed that it could be either express or implied, defining both types. The court next explained that "[i]f you decide that the Defendants committed murder, you must *then* decide whether it is murder of the first or second degree." (Italics added.) The court continued with the pattern instructions defining the element of premeditation necessary for first degree murder. In connection with the lesser offense, the trial court instructed that "The requirements for second degree murder based on express or implied malice are explained in CALCRIM [No.] 520. . . . The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the Defendants not

---

[6] Both the prosecutor and defendant Canseco's trial counsel had made the same point in their earlier arguments.

guilty of first degree murder." The court thereafter instructed on the alternative theory of first degree felony murder without malice.

The court turned to the process of reaching a verdict: "[W]e had everyone here talk about first degree murder, and also *the lesser offense* of second degree murder. . . . [Y]ou've got verdict forms for first degree murder, verdict forms for second degree murder. If you are not satisfied beyond a reasonable doubt that the Defendants are guilty of . . . first degree murder and you unanimously so find, you may nevertheless convict [them] of *the lesser crime* of second degree murder, provided you are unanimously satisfied beyond a reasonable doubt that [they are] guilty of that crime. Thus, you are to determine whether the Defendants are guilty or not guilty of the crime of first degree murder or the lesser crime of second degree murder. . . . [T]he Court *cannot accept a guilty verdict* on the lesser crime of second degree murder *unless you have unanimously found the Defendants not guilty of first degree murder*." (Italics added.) It reiterated, "if you find the Defendants guilty of first degree murder, you should not complete the verdict form on the corresponding lesser offense of second degree murder . . . . [¶] If you find the Defendants not guilty of first degree murder . . . you *then* need to complete the verdict on the . . . included offense[] of second degree murder by determining whether the Defendants are guilty or not guilty of that crime." (Italics added.)

Defendant Canseco contends the jury could reasonably interpret the trial court's instruction at the outset ("You do not all have to agree on the same theory"), after the court had listed three theories that included murder of the second degree, as allowing the jury to return a verdict of first degree murder even though some jurors believed him guilty only of second degree murder. We reject this strained logic.

In the first place, defendant Canseco has forfeited this claim because it is based on what he perceives as an imprecision in an instruction that is otherwise a correct statement of the law, for which he was required to request modification or amplification in the trial

8

court.  (*People v. Lee* (2011) 51 Cal.4th 620, 638.)  We also reject his assertion that trial counsel was ineffective for failing to make such a request because trial counsel could reasonably have concluded that any modification of the instruction was unnecessary, as we will explain.

Under federal and state law, a defendant must establish the *reasonable likelihood* that a *reasonable juror* would have interpreted an instruction in the claimed erroneous manner.  (*Boyde v. California* (1990) 494 U.S. 370, 378, 380 [108 L.Ed.2d 316]; *People v. Williams* (2013) 56 Cal.4th 630, 688.)  While it is theoretically possible that the court's remark at the outset of the discussion of the theories of murder may have suggested of itself that the three theories are interchangeable, the subsequent instructions defining the theories and the process of returning a verdict (and the separate verdict forms for first and second degree murder) made it abundantly clear to the jury that the elements of second degree murder were not relevant to its deliberations over premeditated first degree murder, because it could not return a verdict under a theory of second degree murder until it was unanimously convinced that defendants were not guilty of premeditated first degree murder (or felony murder, for which malice was not even relevant and no decision was necessary on degree).  Moreover, even if the instruction has any ambiguity, nothing in the arguments of counsel suggested that a verdict of first degree murder could rest on a theory of implied malice without premeditation.  (*Middleton v. McNeil* (2004) 541 U.S. 433, 438 [158 L.Ed.2d 701]; *People v. Kelly* (1992) 1 Cal.4th 495, 526-527.)  Rather, counsel referred to the principle of nonunanimous theories to explain why they were discussing both of the theories of felony murder and premeditated murder.  As a result, we reject this argument.[7]

---

[7] Alternately, defendant Canseco does not give any clear explanation of how he could possibly be prejudiced from any ambiguity in this respect, because the jury otherwise found unanimously that he was guilty of attempted robbery, during the course of which a

### B. *Felony-murder Derivative Liability Applies to Conspirators*

The trial court instructed the jury that it could find defendant Canseco guilty of felony murder either as an aider/abettor or as a conspirator. He now contends conspiracy should not be considered a proper basis for derivative liability for felony murder. Based on *People v. Washington* (1965) 62 Cal.2d 777, which declared that the purpose of the felony-murder rule is to deter negligent or accidental deaths during a felony, and that the rule should be strictly construed (*id.* at pp. 781, 783), defendant Canseco asserts "pure" conspirators—presumably those who otherwise neither aid nor abet the commission of the felony—would not have any power to control the manner in which the felony was committed, and therefore no purpose is served extending the rule to them.[8]

The problem with his argument is the Supreme Court's unqualified declarations that conspiracy, even where not prosecuted as an independent offense, is a proper basis for criminal liability for the acts of a coconspirator. (*In re Hardy* (2007) 41 Cal.4th 977, 1025 (*Hardy*); *People v. Belmontes* (1988) 45 Cal.3d 744, 788.) If there is to be any limit on this principle, that court must establish it, not this one. We therefore reject his claim.

### C. *The Felony-murder Special Circumstance Also Applies to Conspirators*

A sentence of life without parole can apply to any person other than the actual killer who, with the intent to kill (or as a major participant with reckless indifference to

---

killing occurred. In light of these findings, the option of second degree murder was not rationally open to any juror. His metaphoric rhetoric notwithstanding, we do not discern how any error in instructions relating to theories of murder could have had any effect on deliberations for the attempted robbery verdict and the special circumstance finding.

[8] The People raise their oft-repeated claim that the failure to object to the instructions on this basis in the trial court forfeits the argument. We have endlessly explained that this contention ignores Penal Code section 1259 (undesignated statutory references are to this code) and controlling Supreme Court precedent, all to no avail. As defendant Canseco accurately explains, "the [People] fail[] to discuss . . . section 1259 . . . , which has been part of California law . . . for more than a century, [because it] is an irritant the [People] prefer[] not to acknowledge." We therefore will disregard this argument in the present case without any further elaboration.

life), aids, abets, counsels, commands, induces, solicits, requests, or assists in committing a felony murder. (§ 190.2, subds. (c) & (d).) The trial court instructed the jury that this special circumstance applied both to those guilty of first degree murder as an aider/abettor or as a member of a conspiracy.

Defendant Canseco asserts that "conspire" is not explicitly included among the other terms in these subdivisions, and therefore its inclusion in the pattern jury instruction for a special circumstance is unwarranted.[9] He points out that one may conspire without aiding/abetting, which requires "actual participation in the . . . offense" (*People v. Malotte* (1956) 46 Cal.2d 59, 65-66), and one can aid or abet a crime without having conspired to do so (*People v. Morante* (1999) 20 Cal.4th 403, 433). He also claims that section 31, which applies "criminal liability as a principal to those who are not present at the commission of an offense" if (with the requisite mental state) they assisted the actual perpetrator (*Morante*, at p. 433), is limited to aiders and abettors, not coconspirators.

His arguments are untenable. Defendant Canseco does not explain how in general a conspirator *who is a major participant* acting at least with reckless disregard of life would not also be aiding and abetting the felony murder even *if* the statute did not contemplate the inclusion of pure conspirators within its reach. He also does not explain how his own conduct in particular would present a situation of a pure conspirator. Further, his interpretation of section 31was rejected in *People v. Mohamed* (2011) 201 Cal.App.4th 515, 523-524, both as a matter of its own independent interpretation of the statute (which has not garnered any criticism in the interim) and in reliance on the unequivocal statement in *Hardy* that "[o]ne who conspires with others to commit a felony is guilty as a principal," *citing the statute in support*. (*Hardy*, *supra*, 41 Cal.4th at

---

[9] Again, we simply disregard the People's claim that defendant Canseco has forfeited this argument because he failed to object to the instruction in the trial court.

11

p. 1025.)  If unconvinced, defendant Canseco may now address his arguments to the Supreme Court; we are neither willing nor able to endorse them.

### D.  Defendant Canseco Is Properly Punished for Both Offenses

Defendant Canseco contends section 654 precluded the trial court from imposing sentence on both offenses.  We disagree.

Where a defendant is prosecuted *solely* on a theory of first degree felony murder, section 654 precludes punishment both for the murder and for the underlying felony. (E.g., *People v. Mulqueen* (1970) 9 Cal.App.3d 532, 547.)  However, if the prosecution rests on the alternative theories of premeditation and felony murder, and there is evidence supporting an implicit finding that the murder was premeditated, then the trial court may properly impose additional punishment for the felony as well.  (*People v. Osband* (1996) 13 Cal.4th 622, 730-731.)

Defendant notes that the prosecutor argued felony murder was "just so applicable . . . that you really don't even have to get into those other [theories]."[10]  However, the prosecutor also argued that the killing could have been premeditated based on the fact that a rifle was superfluous where the shooter and defendants outnumbered the victim. (The prosecutor also argued that if for some reason the jury did not find that there was an attempted robbery, the conduct was still sufficient to establish implied malice for a verdict of second degree murder.)  In any event, it is not the prosecutor's arguments or what the jury found that is controlling.  As we emphasized in *People v. McCoy* (2012) 208 Cal.App.4th 1333, our focus is on *the trial court's* explicit or implicit finding that has substantial evidence in support (*McCoy*, at p. 1338), which can be independent of the facts or theories underlying the jury's verdict in the absence of some circumstance

---

[10]  Defendant Canseco's trial counsel, by comparison, ridiculed the presence of any premeditation as speculation or an intent to rob a longtime friend, and instead argued that "the most just verdict" would be second degree murder premised on implied malice.

12

foreclosing its sentencing discretion (*id*. at p. 1340). It may be that the shooting was an accident in the midst of an intended robbery, but the trial court could also properly infer that the shooter's intent to kill arose out of the frustration of being confronted with a resisting victim who was seeking to gain control of the rifle, or out of a desire to send a message to future victims of the gang's willingness to kill a resisting robbery victim. Therefore, the trial court could properly impose additional punishment for the attempted robbery.

## II. Joint Contentions

### A. *Sufficient Evidence Supports the Gang Enhancement*

In another challenge defendants argue the evidence is insufficient to support the gang enhancements of their determinate sentences in two respects. They claim it does not establish that the offenses are gang related because it does not demonstrate any benefit to a gang. They also assert the trial court improperly allowed the gang expert to express an opinion that they (as opposed to a hypothetical person) committed the crimes for the benefit of or in association with a gang and possessed the necessary specific intent to promote or assist the criminal conduct of gang members.

1. <u>Pertinent evidence</u>.

Defendant Canseco had told his brother that he was a member of a particular gang (identifying the umbrella entity under which various subsets operated). The brother had seen defendant Canseco customarily wearing the color associated with the umbrella entity, and authenticated photographs in which he and his brother were displaying the entity's insignia.

On his arrest, defendant Canseco asserted his affiliation with the umbrella gang entity. Defendant Mendoza had the entity's insignia tattooed on his elbow and chest. Defendant Canseco had an insignia of the entity tattooed on his hand.

13

The gang expert reviewed pictures from defendant Canseco's camera. In his opinion, these showed defendant Canseco and others displaying insignia of the umbrella entity and particular subsets based in Oakland and Tracy. Based on these photographs, self-admittance, his attire, his hand tattoo, and field contacts and reports, the expert believed defendant Canseco was a member of the Oakland subset. Based on tattoos on defendant Mendoza and personal contacts with him dating back several years, the expert believed defendant Mendoza was a member of a Tracy subset of the umbrella entity associated with the Alden Park area. The expert also offered the opinion that the shooter was a member of the same Tracy subset, although he did not provide the jury with the basis for this opinion[11] beyond the fact that the offenses were committed in a coordinated fashion—which indicated the offense was for gang purposes[12]—with two other gang members. Gang members also make heavy use of text messaging. The Tracy gang subsets are known to shoot people for their jewelry and removable gold crown caps. As far as the expert was aware, the victim did not have any local gang associations. The expert did not make any investigation of whether the victim had any gang associations in Oakland where he lived part-time with his father (and had a tattoo referencing that area).

The expert believed the robbery and shooting were committed for the benefit of a gang. He based this opinion on defendant Canseco's commission of the crimes while attired in the color of the umbrella gang entity, which would contribute to the fearsome

---

[11] This was pursuant to an agreement to exclude evidence that the expert was aware defendant Canseco had identified James Stancampiano as the shooter, who was otherwise associated with defendant Mendoza (and therefore defendant Canseco's statement could incriminate defendant Mendoza "because of guilt by association"). We thus reject defendant Mendoza's argument that this opinion should be disregarded for want of a factual basis.

[12] He believed the robbery was for gang purposes even without any announcement of gang affiliation during the commission, because "more and more these days . . . they are trying to conceal their identity."

14

reputation of the local subset. In addition, even under the isolated circumstances of these offenses, "word of mouth spreads like fire" through the gang demimonde "and they know who is who." He admitted that not every crime a gang member commits is for the benefit of the gang.

At the conclusion of the expert's direct examination, the prosecutor asked, "So is your opinion that . . . Edgar Canseco committed . . . this crime for the benefit of . . . or in association with a criminal street gang?" The expert answered, "Yes, I do" and gave the same answer with respect to defendant Mendoza. The prosecutor then asked, "And is it your opinion that Edgar Canseco intended to assist . . . or promote criminal conduct by gang members?" The expert again answered in the affirmative, with the same answer regarding defendant Mendoza.[13]

2. Sufficiency of evidence.

As is pertinent here, the first element of a gang enhancement requires proof that a defendant committed an offense for the "benefit" of a street gang or "in association with" a street gang. (§ 186.22, subd. (b)(1).) "Not every crime committed by gang members is related to a gang." (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).) However, proof of benefit to a gang can be in the form of expert opinion that the commission of an offense enhances the gang's reputation for viciousness, which is sufficient to raise the inference of benefit. (*Albillar*, at p. 63.) If there is substantial evidence that multiple defendants "came together *as gang members*" in the commission of an offense, rather than " 'on a frolic and detour unrelated to the gang,' " this is proof "that they committed these crimes in association with the gang." (*Id.* at p. 62.) The joint commission of an offense is sufficient to infer that the gang members are acting together *qua* gang members

---

**13** The court and the parties were under the impression that an unspecified recent case (the trial took place in June 2012) permitted the prosecutor to frame the questions in this manner.

15

in the absence of evidence to the contrary. (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 (*Morales*).) Proof of such association is sufficient to support the gang enhancement even in the absence of proof of tangible or reputational benefit to a gang. (*Ibid.*)

Defendants assert the prosecutor relied solely on proof of benefit to a street gang, without any citation to the record identifying where the prosecutor supposedly made any such election. However, the *instructions* refer to *both* criteria; accordingly, our review of the evidence is not confined in the manner defendants suggest.

Defendants argue the prosecution did not establish that there would have been any financial benefit to the gang from the commission of a robbery. They acknowledge that the expert indeed testified that the commission of the crimes would nonetheless benefit the gang because this would enhance its vicious reputation. They contend, however, that the robbery as planned would not have communicated the gang's involvement (or their status as gang members involved in the crime), because bystanders were not present[14] and none of the participants communicated any gang involvement during the crimes. They ignore the expert's opinion that word of mouth would nonetheless have quickly and effectively communicated the gang's involvement to the gang and its rivals, even if the general population or police might not have known.

Furthermore, they ignore (until defendant Mendoza's reply brief) the evidence of the alternate criterion of committing the crime in association with gang members. This forfeits the argument. (*Sourcecorp*, *Inc. v. Shill* (2012) 206 Cal.App.4th 1054, 1061, fn. 7.) It is thus sufficient for us to note that the extensive coordination of the attempted robbery with other identified members of the umbrella entity is sufficient to establish this

---

[14] There was at least one bystander—the victim's girlfriend.

criterion.[15]  It is untrue, as defendants argue, this would result in the imposition of the enhancement as a matter of law whenever gang members jointly commit a crime.  A jury must first be convinced to draw this inference (as opposed to the alternative inference that the gang members were acting on a lark) before sustaining the enhancement.

3.  The opinion testimony.

Also at issue here is another element of the gang enhancement, which requires proof of a specific intent to promote or assist the criminal conduct of gang *members*, as opposed to the gang itself.  (*Albillar*, *supra*, 51 Cal.4th at p. 67; *Morales*, *supra*, 112 Cal.App.4th at p. 1198; § 186.22, subd. (b)(1).)  Again, substantial evidence of the joint commission of an offense with other known gang members is sufficient of itself to supply an inference of specific intent to promote or assist other gang members, in the absence of evidence to the contrary.  (*Albillar,* at p. 68; *People v. Villalobos* (2006) 145 Cal.App.4th 310, 322 [cited with approval in *Albillar*, at pp. 65-66].)

Defendants contend the prosecutor was not permitted to ask the expert whether *they* (as opposed to a hypothetical person based on the facts of the case) satisfied the two criteria for the gang enhancement.  They recognize that their trial counsel failed to object either to the prosecutor's questions or to the answers of the expert witness.  Defendant Canseco asserts (with the concurrence of defendant Mendoza) that this lapse was an instance of  prejudicial ineffective assistance of counsel.

---

**15**  In his reply brief, defendant Mendoza mentions in passing that defendant Canseco was a member of a different subgroup of the umbrella entity than defendant Mendoza or the shooter without further developing the point.  As this argument is forfeited, we simply observe that we have previously noted it is sufficient for a prosecutor to prove the goals and identifying characteristics of an umbrella entity without further identifying the particular subsets where there is an absence of any evidence that the subgroups have divergent goals or activities.  (*People v. Ortega* (2006) 145 Cal.App.4th 1344, 1357.)

We agree that the prosecutor improperly framed the question.  The People do not attempt to defend the propriety of the questions.  *People v. Vang* (2011) 52 Cal.4th 1038, 1047-1048, specifically held that an opinion premised on hypothetical questions based closely on the particular *evidence* at trial are permissible, whereas questioning whether a particular *defendant* satisfied the criteria for the gang enhancement is prohibited because it does not assist the jury on the question of guilt.  (Accord, *People v. Gonzalez* (2006) 38 Cal.4th 932, 946-947 & fn. 3.)  We cannot determine on what other controlling authority to the contrary the trial court and the parties apparently relied.

However, we also agree with the People that the error was harmless.  Defendants argue the evidence was otherwise insufficient to support the enhancement.  However, we have already identified the substantial evidence in support of the first criterion other than the opinion.  The commission of the offense in concert with other gang members is also sufficient evidence of itself to establish an inference of the intent to promote or assist criminal conduct of gang members.  Defendant Canseco also suggests (in a scant couple of sentences) that the improper expert opinion *could have* affected the jury's evaluation of his status as an aider/abettor of the underlying offenses.  He does not explain, however, how the verdicts might have been any different in the absence of the expert opinion, or establish that the opinion essentially directed a verdict on the enhancement, given that the jury received the customary instruction that it was not bound to accept expert opinions.  (*People v. Prince* (2007) 40 Cal.4th 1179, 1227.)  We thus reject his claim of prejudice.  (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.)

### B.  *Sufficient Evidence Supports the Special Circumstance Finding*

*Enmund v. Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140] analyzed whether the Eighth Amendment's proscription against a punishment disproportionate to the crime committed (*id*. at p. 788) prevented "imposition of the death penalty on one . . . who aids and abets a felony in the course of which a murder is committed by others but who does

18

not . . . kill, attempt to kill, or intend that a killing take place or [that there will be the use of] lethal force . . . ." (*Enmund*, at p. 797.)  It concluded a death sentence for felony murder *simpliciter* without *any* proof of a culpable mental state was unconstitutional. (*Id*. at p. 788; see *Tison v. Arizona* (1987) 481 U.S. 137, 147 [95 L.Ed.2d 127] (*Tison*).) *Tison* later limited the rule in *Enmund* to the status of constitutional subflooring.  *Tison* held that an actual intent to kill is unnecessary; a death sentence is proportionate in a felony murder if there is proof of the overlapping criteria that a defendant substantially participated in the crime resulting in the death, and had a reckless indifference to human life that is "implicit in knowingly engaging in criminal activities known to carry a grave risk of death" as a "natural, though also not inevitable . . . result." (*Tison*, *supra*, 481 U.S. at pp. 157-158 & fn. 12.)  *Tison* explicitly eschewed any "attempt to precisely delineate the particular types of conduct" that constitute a reckless indifference to human life.  (*Id*. at p. 158.)  This reasoning in connection with the penalty of death is equally applicable to a sentence of life without parole.  (*People v. Estrada* (1995) 11 Cal.4th 568, 575-576.)

Asserting that *as planned* the robbery presented little likelihood that the victim would resist or that bystanders would interfere or summon the police, and thus there was a "minimum risk of the situation escalating," defendants argue there is consequently insufficient evidence that they should have been subjectively aware of a grave risk of death.  They also contend the evidence does not establish an actual intent to kill on their part.  (They do not dispute the sufficiency of the evidence of their major participation in the attempted robbery.)  We conclude a *reasonable* trier of fact could find on the present record that defendants were recklessly indifferent to human life (*People v. Johnson* (1980) 26 Cal.3d 557, 575-578) even if that is not the *only* finding possible on the evidence.  As a result, we do not need to consider the scant evidence that the People

19

marshal in support of an implied finding that defendants themselves intended to kill the victim while leaving the girlfriend alive.

We have previously rejected the suggestion that staging a robbery in a secluded area decreases the risk of violence. (*People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118.) Whether or not defendant Mendoza was aware that the shooter would be using a rifle in the robbery, he participated in the robbery and fled the scene after the victim was shot without any attempt at coming to the victim's aid. This is sufficient of itself to establish reckless indifference to human life, because a grave risk of death arose during the commission of the robbery despite any purported planning to the contrary. (*People v. Smith* (2005) 135 Cal.App.4th 914, 927-928; *People v. Hodgson* (2003) 111 Cal.App.4th 566, 580 & fn. 34, citing *Tison*.) As for defendant Canseco, the claim of insufficient evidence is ludicrous. Not only did he participate in planning the robbery, the evidence supports an inference that he supplied the rifle to the shooter, he lured the victim to the isolated location, he participated in the robbery, and he also fled the scene without offering any aid to the victim. That he may not have intended the shooting of the victim is irrelevant. (*Lopez*, *supra*, 198 Cal.App.4th at p. 1117; *People v. Proby* (1998) 60 Cal.App.4th 922, 930; *People v. Mora* (1995) 39 Cal.App.4th 607, 612, 617.) We therefore reject this argument.

## DISPOSITION

The judgments are affirmed.

          BUTZ          , J.

We concur:

     BLEASE     , Acting P. J.

     MURRAY     , J.

20